UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


| | |
|---|---|
| **BRIAN JACKSON AND LINDA JACKSON** | **CIVIL ACTION** |
| **VERSUS** | **NO: 95-2389** |
| **F.I.E. CORP. ET AL.** | **SECTION: "S" (2)** |

### ORDER AND REASONS

**IT IS ORDERED** that defendant Fratelli Tanfoglio, S.n.c.'s Motion to Vacate Default Judgment (Document 77) is hereby **GRANTED**. Because the court lacks personal jurisdiction, Fratelli Tanfoglio is hereby **DISMISSED WITHOUT PREJUDICE**.

**A.    Background.**

On May 28, 1992, Arnold Jackson was walking into his residence in New Orleans, Louisiana, when he dropped a paper bag containing a Titan .25 caliber pistol. The pistol discharged on impact and its bullet severed Jackson's spinal cord, rendering him a quadriplegic. Jackson and his wife Linda filed suit one year later against Fratelli Tanfoglio and several other defendants.[1] The Jacksons alleged that Fratelli Tanfoglio, an Italian entity, "supplied and produced" the Titan .25 caliber pistol that caused Mr. Jackson's injuries.[2]

---

[1] The Jacksons' son, Brian, was substituted as a party plaintiff when Mr. Jackson died during the pendency of this suit.

[2] *See* plaintiffs' Petition for Damages at paragraph 1.(b). The Petition also alleged that the defendants "are liable, in solido" for Arnold Jackson's injuries "by reason of having produced, sold, and distributed a defectively dangerous product causing damages" to him. *Id.* at paragraph 9.

Although properly served, Fratelli Tanfoglio did not file an answer or otherwise respond to the suit. The Jacksons obtained an entry of default against Fratelli Tanfoglio on November 8, 1996, and later moved to obtain a judgment by default under Rule 55 of the Federal Rules of Civil Procedure. After a delay caused by the Jacksons' appeal of a final judgment rendered against another defendant, the court held a hearing on the Jacksons' motion for default, with testimony from the plaintiffs, their firearms expert (by deposition), and several damages witnesses. On December 18, 1998, the court granted the judgment by default, and rendered an $11.02 million judgment in favor of the Jacksons against Fratelli Tanfoglio and two other Italian defendants. Based on the record before it, the court found in the Amended Reasons for Judgment that defendant Southern Diecast Corporation cast the form for the Titan .25 caliber pistol at issue and shipped it to Italy, where it was used by the Italian defendants to manufacture the firearm. The court also found that the Italian defendants designed, manufactured, and distributed the pistol that caused Arnold Jackson's injuries. The court held that the pistol's firing pin was defective in design:

> The testimony of plaintiff's expert, Lama S. Martin, clearly established that the defective design of the pistol caused the pistol to fire. Martin testified that the percussion type design of the gun was obsolete, unsafe and ignored basic engineering principles in gun manufacturing in effect for over one hundred years. Specifically, the firing pin in the pistol was too long and the long firing pin allowed the uncocked pistol to fire when dropped.[3]

Almost two years after the default judgment against it, Fratelli Tanfoglio made its first appearance in this suit by filing a Rule 60(b)(4) motion to vacate the default judgment, arguing that the court lacks personal jurisdiction. On May 25, 2001, the court denied Fratelli Tanfoglio's motion,

---

[3] December 31, 1998 "Amended Reasons for Judgment" (Doc. 72) at p.4.

finding that specific jurisdiction existed over Fratelli Tanfoglio because its default conclusively established certain facts:

> In this case, it is conclusively established as a result of Fratelli Tanfoglio's default that it produces its products for "use and distribution in general in the United States," and that it (1) "supplied and produced a defective product [the Titan .25 caliber pistol] causing damages in Louisiana," and (2) "produced, sold, and distributed a defectively dangerous product causing damages to the plaintiff Arnold Jackson." These factual allegations are sufficient to justify the exercise of personal jurisdiction over Fratelli Tanfoglio.[4]

Fratelli Tanfoglio appealed the court's ruling. On August 20, 2002, the Fifth Circuit Court of Appeals vacated the court's finding that it had personal jurisdiction, holding that "the jurisdictional allegations and findings supporting the court's default judgment" were "not entitled to preclusive effect in the personal-jurisdiction context." Accordingly, the court remanded the case:

> . . . for further (and adversarial) proceedings, including appropriate discovery, on the issue of personal jurisdiction, whether specific, general, or both.
>
> We are aware that remand may saddle the district court with the arduous task of determining the jurisdictional contacts of each of the Tanfoglio firms, and, if necessary, analyzing - perhaps even under Italian law - whether any of the defunct Tanfoglio firms' contacts should be imputed to the surviving entity, Fratelli Tanfoglio.
>
> \*    \*    \*
>
> We also realize that remand could produce anomalous results. It is at least theoretically conceivable that the district court might, for specific-jurisdiction purposes, find that Fratelli Tanfoglio did not make the pistol or any of its components and cannot be imputed with having done so; and yet, if the court should also determine that *general* personal jurisdiction does lie as the result of continuous and systematic contacts with Louisiana, the court might conclude that it nevertheless

---

[4] May 25, 2001 "Order and Reasons" (Doc. 127) at p.10.

must enforce its judgment against Fratelli Tanfoglio, on the theory that, *as a merits fact*, the manufacture of the pistol cannot be further litigated. If remand should indeed produce such a paradox, that would simply be the price for the collision here of two basic principles to which we owe fealty: that a default judgment is final on the merits, on the one hand, and on the other, that a default judgment always may be challenged for want of personal jurisdiction."[5]

Following remand, the parties engaged in an additional four years of discovery, and the court conducted an evidentiary hearing relating to the existence of personal jurisdiction on May 18, 2006.

**B.     Analysis.**

Rule 60(b)(4) provides that "the court may relieve a party . . . from a final judgment" if "the judgment is void," which may occur "if the court that rendered it lacked jurisdiction of the subject matter, or of the parties, or it acted in manner inconsistent with due process of law." *Carter v. Fenner*, 136 F.3d 1000, 1006 (5th Cir.), *cert. denied*, 525 U.S. 1041, 119 S. Ct. 591, 142 L.Ed.2d 534 (1998). Fratelli Tanfoglio bears the burden of demonstrating that the court lacks personal jurisdiction.[6]

In order for personal jurisdiction to exist over Fratelli Tanfoglio, jurisdiction must be authorized by a state statute and the exercise of personal jurisdiction over it must not offend the Constitution. *Allred v. Moore & Peterson*, 117 F.3d 278, 281 (5th Cir. 1997), *cert. denied*, 522 U.S. 1048, 118 S. Ct. 691, 139 L.Ed.2d 637 (1998). Because Louisiana's long arm statute is coextensive

---

[5] *Jackson v. FIE Corp.,* 302 F.3d 515,531 (5th Cir.2002)(italics in original).

[6] *See Jackson,* 302 F.3d at 521, n.6 (noting that "it is now the law of the case" that Fratelli Tanfoglio bears the burden of proving the absence of personal jurisdiction.)

4

with the limits of due process, "the sole inquiry into jurisdiction over a nonresident [under Louisiana law] is a one-step analysis of the constitutional due process requirements." *Patin v. Thoroughbred Power Boats Inc*. 294 F.3d 640, 652 (5th Cir. 2002).

The constitutional due process standards for exercising personal jurisdiction over a nonresident are patent. Requiring that a defendant have "minimum contacts" with the forum state is "the constitutional touchstone" for personal jurisdiction. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). The "minimum contacts" requirement can be established through contacts sufficient to assert either general or specific jurisdiction:

> The Due Process Clause of the Fourteenth Amendment guarantees that no federal court may assume jurisdiction in personam of a non-resident defendant unless the defendant has meaningful "contacts, ties, or relations" with the forum state. Jurisdiction may be general or specific. Where a defendant has "continuous and systematic general business contracts with the forum state," the state may exercise "general" jurisdiction over any action brought against that defendant. Where contacts are less pervasive, the court may still exercise "specific" jurisdiction "in a suit arising out of or related to the defendant's contacts with the forum."

*Luv N' Care, Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465, 469 (5th Cir. 2006) (citations omitted). Plaintiffs contend that the court may exercise both specific jurisdiction and general jurisdiction over Fratelli Tanfoglio.

**1.    Specific Jurisdiction**.

The Fifth Circuit has adopted a three-factor test for determining whether specific jurisdiction may be exercised over a nonresident defendant, requiring the court to analyze:

> (1) whether the defendant has minimum contacts with the forum state, i.e., whether it purposefully directed its activities toward the forum state or purposefully availed itself of the privileges of conducting activities there; (2) whether the plaintiff's cause

>of action arises out of or results from the defendant's forum-related contracts; and (3) whether the exercise of personal jurisdiction is fair and reasonable.

*Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 271 (5th Cir. 2006).

The first step of this test involves determining whether Fratelli Tanfoglio purposefully directed its activities towards Louisiana. The parties have conducted voluminous discovery concerning the nature and extent of any conceivable contact by Fratelli Tanfoglio with Louisiana, and there is no evidence in the record that Fratelli Tanfoglio itself shipped any of its finished products or component parts into Louisiana.[7] However, it is undisputed that Fratelli Tanfoglio has delivered a considerable number of firearms, along with firearm component parts, to successive distributors in Florida, who in turn sold them to retail outlets in other states, including Louisiana.

In *Bean Dredging Corp. v. Dredge Technology Corp.*, 744 F.2d 1081 (5th Cir. 1984), the defendant, Rogers-Olympic, made steel castings used in the manufacture of hydraulic cylinders. Rogers-Olympic sold some castings to Abex Corporation, which used them in the manufacture of cylinders in California. The cylinders were eventually used as parts of a dredge manufactured in Louisiana. Plaintiff Bean Dredging alleged that the cylinders were defective, and sued certain suppliers and manufactures in Louisiana; these defendants brought a third-party action against Rogers-Olympic. The evidence before the court was that Rogers-Olympic had no knowledge of the end product into which the castings would be incorporated, that it never sold directly to a company

---

[7] It is unknown how the pistol that injured Jackson came to be located in Louisiana. The parties have stipulated that plaintiff, who was a New Orleans police officer, "obtained the subject Titan .25 caliber pistol [bearing serial number 26201 and FIE trademark] when he found it in the backseat of his police car." *See* "Proposed Joint Stipulation of Fact" (Doc. 41) (herinafter "Joint Stipulation") at p. 5.

in Louisiana, that it did not solicit contracts or other work in Louisiana, and did not own property in Louisiana. The court discussed a previous case, *Oswalt v. Scripto, Inc.*, 616 F.2d 191 (5th Cir. 1980), and held that specific jurisdiction existed over Rogers-Olympic:

> Whereas in *Oswalt v. Scripto* the manufacturer introduced millions of lighters into the stream of commerce, in the instant case Rogers-Olympic introduced thousands of steel castings into that stream. The difference in numbers is not enough to convince us that Rogers-Olympic had no interest in reaching as broad a market as it possibly could. As in *Oswalt v. Scripto*, the manufacturer here evidenced no attempt to limit the states in which its castings would be sold and used, albeit as a component part of a larger product.
>
> Moreover, the mere fact of being a component-part manufacturer affords Rogers-Olympic no solace. The fact remains that even though Rogers-Olympic "did not originate the distribution system and [does] not control it, [the company] did place the [steel castings] in and move them along a stream of commerce destined for retail sale in [finished products] throughout the United States."

*Id.* at 1085 (emphasis and brackets in original); *see also Luv N'Care*, 438 F.3d at 465 (holding that Colorado defendant was amenable to suit in Louisiana even though it sold all of its products to Wal-Mart in Colorado; defendant delivered its products into the stream of commerce and benefitted from Wal-Mart's national retail delivery system, making no attempt to limit the states into which its products would be sold).

Fratelli Tanfoglio admitted in discovery that between 1980 and 1990 it sold products to F.I.E. Corp. and Excam, Inc. in Florida, and that a majority of its firearms were distributed to these two Florida companies. As of the date of Fratelli Tanfoglio's discovery responses, approximately 80% of its products were exported outside of Italy, approximately 30% of which were exported, distributed and sold to the United States. Although there is scant evidence in the record concerning the precise number of firearms either made by Fratelli Tanfoglio or containing Fratelli Tanfoglio

parts that were sold to Louisiana residents, at no time has Fratelli Tanfoglio sought to limit the geographic scope of its products' distribution or prohibit American importers from distributing its products in Louisiana. Additionally, plaintiffs have provided the court with the affidavit of William H. Winstead, a former National Sales Manager of FIE, who attests that FIE "sold and distributed Tanfoglio products, including the Titan .25 for most all of the states in the US," and that "Louisiana was a primary market for Tanfoglio guns and parts distributed for Tanfoglio by FIE."[8] This evidence is sufficient to satisfy the minimum contacts prong of the specific jurisdiction inquiry.

The second step in the specific jurisdiction inquiry requires an examination of whether the plaintiffs' cause of action arises out of defendant's contacts with the forum state. Indeed, this question implicates a central issue in this case: did Fratelli Tanfoglio manufacture the .25 caliber pistol (or its defective firing pin) that injured Jackson in May 1992? Both plaintiffs and defendant agree that the pistol was assembled or manufactured in Florida by F.I.E. Corp., which then sold it to the public under the F.I.E. logo.[9] Plaintiffs, however, argue that the pistol incorporated parts manufactured by Fratelli Tanfoglio, including a defective firing pin; Fratelli Tanfoglio strenuously

---

[8] Plaintiffs' Exhibit 28.

[9] *See* "Plaintiffs' Memorandum" (Doc. 508) at p. 3 ("Fratelli 'took' . . . the tool that bored the holes for the 6.35 mm (.25 auto caliber pistol) before the Jackson pistol was made. These parts were manufactured in Italy and sent to FIE in the U.S. to assemble on the frame (made from the Italian dies)."); "Fratelli Tanfoglio, S.n.c.'s Opposition to the Plaintiffs' Post-Trial Memorandum and Memorandum in Support of Motion to Vacate Default Judgment Pursuant to Fed.R. Civ.P. 60(b)(4)" (Doc. 509) at p. 10 ("The subject pistol was made by FIE with some parts possibly supplied by Tanfoglio Giuseppe, S.r.l."). Additionally, Fratelli Tanfoglio has submitted the affidavit of Gerald R. Crispino, a former Special Agent with the Bureau of Alcohol, Tobacco, and Firearms. Crispino confirms, based on a serial number trace, that the Titan .25 pistol that injured Jackson was manufactured by FIE. Defendant's Exhibit 5.

denies this fact. As support for their claim, plaintiffs can point only to the deposition testimony of Bortolo Tanfoglio, which is ambiguous at best, concerning whether the molds for manufacturing the barrel of .25 caliber pistols were even possessed by Fratelli Tanfoglio in 1992, and denying that Fratelli Tanfoglio manufactured the defective firing pin which caused the pistol to discharge upon striking the ground.[10] There is no other evidence in the record supporting plaintiffs' claim that Fratelli Tanfoglio had any role in the manufacture of the defective firing pin of the pistol that injured Jackson. The court finds that Bortolo Tanfoglio's deposition testimony, coupled with the lack of competent evidence supporting Fratelli Tanfoglio's manufacture of the firing pin, satisfies defendant's burden.

However, this is not the end of the analysis of the second factor for determining whether specific jurisdiction exists. Plaintiffs claim that the specific jurisdiction inquiry should focus not only on Fratelli Tanfoglio, but also on numerous other corporations whose contacts should be imputed to Fratelli Tanfoglio.

The first such company is Tanfoglio Giuseppe. The parties have devoted considerable effort into determining whether Tanfoglio Giuseppe's contacts should be imputed to Fratelli Tanfoglio, engaging experts in Italian law who have prepared reports opining whether Fratelli Tanfoglio assumed any legal responsibility for Tanfoglio Giuseppe's alleged debts on or before Tanfoglio

---

[10] Bortolo Tanfoglio first stated that Fratelli Tanfoglio did not bore the barrels for .25 pistols, then contradicted himself by stating that Fratelli Tanfoglio bought the bores for these barrels in 1972 or 1973 – which itself contracts a prior affidavit Bortolo executed that was provided to the court. *See* Depo. Bortolo Tanfoglio at pp. 249-50. However, Bortolo Tanfoglio was consistent in denying that Fratelli Tanfoglio made the firing pin of the pistol. *Id.* at p. 61.

Giuseppe's final liquidation in 1996. However, even if such contacts could be imputed to Fratelli Tanfoglio, the record does not contain any evidence demonstrating that those contacts would support specific jurisdiction. There is no evidence that Tanfoglio Giuseppe played a role in manufacturing the specific pistol or the firing pin of the pistol that injured Jackson. Massimo Tanfoglio, the former sole director of Tanfoglio Guiseppe, testified in his deposition that as far as he knew, "currently there would be no way to prove" whether Giuseppe Tanfoglio or some other company made the firing pin on the pistol that injured Jackson.[11] He first stated that Tanfoglio Giuseppe "never built either complete pistols or components of the Titan" including its firing pins,[12] but later admitted that the firing pin "could" have been made by Tanfoglio Giuseppe.[13] Additionally, Massimo Tanfoglio testified that he knew that F.I.E. itself "built parts, including firing pins" for the Titan pistols "during all those years when we either did not have those parts or we were late in shipping the parts."[14] The court finds that there is insufficient evidence in the record to establish that Tanfoglio Giuseppe's manufactured the pistol or its firing pin.[15]

---

[11] *Id.* at pp. 153-54.

[12] Depo. Massimo Tanfoglio, Defendant's Exhibit 13, at p. 96.

[13] *Id.* at p. 87. Bortolo Tanfoglio, a Fratelli Tanfoglio principal who was formerly affiliated with Tanfoglio Giuseppe, was similarly circumspect, stating that without seeing the firing pin itself, he could not say whether it was made by a third party company for Tanfoglio Giuseppe or was made by F.I.E. Exhibit 14 at pp. 53-66.

[14] *Id.* at p. 88.

[15] At the evidentiary hearing, plaintiffs indicated their belief that defendants had destroyed relevant documents which might have served to buttress their claims, and suggested that a spoliation sanction or some sort of adverse inference might be appropriate. However, plaintiffs did not formally move for such an inference and did not provide any evidence to the

Additionally, plaintiffs claim that three Florida corporations, namely Excam, Inc., F.I.E., and European American Armory (EAA) formed the "American Connection" for Fratelli Tanfoglio, and were successively set up by Fratelli Tanfoglio to facilitate distribution of its products in the United States.[16]  In *Freudensprung v. Offshore Technical Services, Inc.,* 379 F.3d 327 (5th Cir. 2004), the Fifth Circuit addressed the imputation of contacts by allegedly related corporations in the specific jurisdiction context, holding:

> As a general rule . . . the proper exercise of personal jurisdiction over a nonresident corporation may not be based solely upon the contacts with the forum state of another corporate entity with which the defendant may be affiliated.  This principle, however, is not inviolate.  Rather, the presumption of institutional independence of related corporate entities may be rebuffed by "clear evidence," which requires a showing of "something beyond" the mere existence of a corporate relationship between a resident and nonresident entity to warrant the exercise of jurisdiction over the nonresident.  Accordingly, our cases "[g]enerally demand proof of control by [one corporation] over the internal business operations and affairs" of another corporation to make the other its agent or alter ego, and hence "fuse the two together for jurisdictional purposes."  In determining whether a plaintiff asserting personal jurisdiction has overcome the presumption of corporate separateness, this Court considers the following nonexhaustive factors: (1) the amount of stock owned by the parent of the subsidiary; (2) whether the entities have  separate headquarters, directors, and officers; (3) whether corporate formalities are observed; (4) whether the entities maintain separate accounting systems; and (5) whether the parent exercises complete control over the subsidiary's general policies or daily activities.

---

court supporting that claim.

[16] Plaintiffs have not named Excam or EAA in their suit, nor have they included any allegations in the complaint or its amendments asking the court to impute the contacts of these companies to Fratelli Tanfoglio.  Although plaintiffs did sue FIE, they did not include any allegations that its corporate separateness should be disregarded, and they dismissed F.I.E. without prejudice prior to obtaining their default judgment against Fratelli Tanfoglio

*Id.* at 346 (citations omitted); *see also Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1159 (5th Cir. 1983).

With regard to F.I.E., plaintiffs have supplied the court with the affidavit of Eddie Diaz, an F.I.E. assistant manager from 1969 through the late 1980s, who attests that employees of Fratelli Tanfoglio and Giuseppe Tanfoglio (who Diaz believed were essentially the same company) often traveled to Florida to "observe and lend advice concerning our testing and assembly of various Tanfoglio products," and that F.I.E. employees would similarly travel to Italy "from time to time" in order to receive "advice and training concerning Tanfoglio products sent to F.I.E. for assembly and distribution throughout the USA."[17]

As to either Excam or EAA, the only evidence in support of the *Freudensprung* factors is that some of Fratelli Tanfoglio's principals served as directors of either Excam or EAA, namely Bortolo Tanfoglio (Director of EAA and Director of Fratelli Tanfoglio from 1971 to 2001); Massimo Tanfoglio (Director of EAA and Administrator of Fratelli Tanfoglio from 1995 to 1999); and Maria Tanfoglio (Director of EAA, Director of Excam, and Managing Director of Fratelli Tanfoglio from 1982 to 1991).[18]  There is also evidence that the Tanfoglio siblings owned 90% of Excam's stock. No other evidence supporting the *Freudensprung* factors exists in the record.  In discovery defendants stated that they "did not and never have participated in the business affairs and/or

---

[17] Diaz affidavit at P.1.

[18] "Fratelli Tanfoglio, S.n.c.'s First Supplemental Objections and Responses to Plaintiffs' Interrogatories and Requests for Production" Number 8; Interrogatory Response Number 11.

management of European American Armory Corp."[19] This evidence is insufficient to support the conclusion that Fratelli Tanfoglio controlled the internal business operations and affairs of F.I.E. or the other Florida distributors such that they became its *alter egos*, or to overcome the presumption of corporate separateness.[20]

Accordingly, the court finds that, because there is insufficient evidence in the record to support plaintiffs' contention that their cause of action arises out of or results from Fratelli Tanfoglio's forum-related contacts, specific jurisdiction does not exist over Fratelli Tanfoglio. .

**2.    General jurisdiction**.

The test for establishing general jurisdiction is not easy to meet:

When a plaintiff's claim does not arise out of a defendant's contacts with a forum, then the defendant's contacts with the forum must be "continuous and systematic" to satisfy the requirements of due process.

As commentators have recognized, the continuous and systematic contacts test is a difficult one to meet, requiring extensive contacts between a defendant and a forum. The Supreme Court has upheld an exercise of personal jurisdiction when the suit was unrelated to defendant's contacts with a forum only once.

---

[19] "Fratelli Tanfoglio's Supplemental Objections and Responses to Plaintiffs' Requests to Admit Facts and Genuineness of Documents Propounded to Fratelli Tanfoglio, S.n.c." (plaintiffs' Exhibit 66) at p. 9, Supplemental Response to Request to Admit 11.

[20] In discovery Fratelli Tanfoglio indicated that Murph C. Bernkrant was F.I.E.'s President, but other than this fact it had "no other information concerning the corporate structure" of F.I.E. "Fratelli Tanfoglio, S.n.c.'s Supplemental Objections and Responses to Plaintiffs' Interrogatories Propounded to Fratelli Tanfoglio, S.n.c." (plaintiffs' Exhibit 66) at pp. 4-5, Supplemental Response to Interrogatory No. 1.

*Submersible Systems, Inc. v. Perfadora Central*, S.A. de C.V., 249 F.3d 413, 419 (5th Cir. 2001).[21] The Supreme Court's decision in *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984) illustrates the difficulty of establishing general jurisdiction over a nonresident corporation. The *Helicopteros* defendant was a Colombian corporation that was sued in Texas for personal injuries arising out of the crash of one of its helicopters in Peru. Defendant had negotiated the contract to provide helicopter services in Texas, purchased 80% of its helicopter fleet (for over $4.0 million) from a Texas company, sent its pilots to Texas for training, sent members of its management to Texas for technical consultations, and had accepted $5.0 million in payments from a Texas joint venture (in funds drawn on a Texas bank). Nevertheless, the Supreme Court found that general jurisdiction was lacking. *See id.* at 416-19.

In the present case, the court finds that the contacts by Fratelli Tanfoglio with Louisiana are insufficient to establish general jurisdiction, even if the contacts of Tanfoglio Giuseppe are imputed to Fratelli Tanfoglio. Fratelli Tanfoglio was formed in 1969, and Tanfoglio Giuseppe, Srl was formed in 1981 as a successor to the individual firm Fabrica D'Armi di Tanfoglio Giuseppe. Neither company has ever had any employees in Louisiana, had an agent for service of process in Louisiana,

---

[21] The sole Supreme Court decision upholding general jurisdiction is *Perkins v. Benguet Consolidated Mining Co.*, 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed.485 (1952). *Perkins* was a unique case in which a Philippine corporation set up operations in Ohio during the Japanese occupation of the Philippines. During that time, the Philippine corporation conducted meetings in Ohio, maintained the corporation's records and bank accounts in Ohio, distributed salary checks drawn on Ohio banks, and made all of its important business decisions in the state. The Supreme Court found that the Philippine corporation was subject to general jurisdiction in Ohio because it "ha[d] been carrying on in Ohio a continuous and systematic, but limited, part of its general business." *Id*. at 438.

or has ever sold any products directly to this state.[22]  The record reflects that Maria Tanfoglio, a Legal Representative of Fratelli Tanfoglio (as well as a shareholder of Tanfoglio Giuseppe from 1978 to 1982), attended a "Shooting, Hunting, and Outdoor Trade Show and Conference" (a "SHOT show") in New Orleans, Louisiana in 1987.  Additionally, Massimo Tanfoglio, the sole director of Tanfoglio Giuseppe from 1981 to 1991 and a "Legal Representative" of Fratelli Tanfoglio, attended a SHOT show in New Orleans, Louisiana in 1992.[23]  These are the only contacts identified in the record between Fratelli Tanfoglio and Giuseppe Tanfoglio and the forum state.  There is no evidence that either company owned property in Louisiana, paid taxes in Louisiana, filed suit (or, with the exception of this litigation, been sued) in Louisiana, were authorized to do business in Louisiana, had a mailing address in Louisiana, or directed any specific advertising to Louisiana.

Because there is no evidence in the record demonstrating that either Fratelli Tanfoglio's or Tanfoglio Guiseppe's contacts with Louisiana are continuous and systematic, the court finds that general jurisdiction does not exist over Fratelli Tanfoglio.

---

[22] Joint Statement at P. 13.

[23] Joint Statement, *passim.*

**D.      Conclusions**.

The evidence in this record do not support the exercise of personal jurisdiction, either specific or general, over Fratelli Tanfoglio.  Accordingly, Fratelli Tanfoglio, S.n.c.'s Motion to Vacate Default Judgment is granted, and Fratelli Tanfoglio is hereby dismissed without prejudice.

New Orleans, Louisiana, this   30th day of April, 2007.

_____
**MARY ANN VIAL LEMMON
UNITED STATES DISTRICT JUDGE**